# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| TWANA CLAY | * | CIVIL ACTION NO. 08-0072 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Twana Clay, born September 16, 1971, filed applications for disability insurance benefits and supplemental security income on May 22, 2001, alleging a disability onset date of May 21, 2001, due to chronic pain syndrome, asthma, thyroid problems, and depression. After the Administrative Law Judge ("ALJ") issued an adverse decision, claimant filed for review with the Appeals Council. By order dated July 15, 2005, the Appeals Council ordered a new hearing because the recording of the ALJ's hearing was partially inaudible.

Before the Appeals Council's decision, claimant filed another set of applications on September 18, 2003. After another ALJ issued an adverse decision on the second set of applications, claimant applied to the Appeals

Council for review.  By order dated June 1, 2006, the Appeals Council vacated

that decision, and ordered that the claims files for the two sets of applications be

consolidated.

On June 6, 2006, the first ALJ conducted a hearing on the consolidated

claims.  By decision dated June 30, 2006, the ALJ found claimant not disabled.

After the Appeals Council denied claimant's request for review on December 6,

2007, claimant filed for judicial review with this Court.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the

parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial

evidence in the record to support the Commissioner's decision of non-disability.

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and

conclusions regarding claimant's disability is not supported by substantial

evidence, based on the following:[1]

**(1) Records from Dr. Douglas Bernard dated March 1, 1999**.  Claimant

stated that she had been in an automobile accident on January 2, 1999, in which

---

[1]As to the claim for a period of disability and disability insurance, the claimant's earnings record shows that claimant has acquired sufficient quarters of coverage to remain insured through March 31, 2006.  (Tr. 24).  Thus, claimant must establish disability on or before that date. *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir.1990).

she sustained back and neck injuries resulting in pain. (Tr. 130). She also complained of hip problems, numbness in her right arm, and shortness of breath. Cervical, lumbar and hip x-rays and a bone scan were normal. (Tr. 136-40).

Claimant was very jumpy during the exam, even to light touch. Dr. Bernard's impression was complaints of right shoulder and neck pain, thoracic pain, and lower back pain. (Tr. 131).

An MRI of the thoracic and lumbar spines dated March 16, 1999, was normal. (Tr. 141-42). Dr. Bernard reassured claimant on March 18, 1999, that she was "just fine" and could pursue activities as tolerated. (Tr. 144).

**(2) Records from Dr. Stephen Boudreaux dated August 11, 1975 to December 12, 2000**.[2] Claimant was treated for colds, vertigo, headaches, and bronchitis. (Tr. 157-169). On February 1, 1999, she was seen for follow up after a car accident with complaints of headaches, and left leg pain. (Tr. 156). She complained of feeling a "crack" in her left hip in February, 1999. (Tr. 155).

On March 22, 1999, she was seen for follow up of thyroid problems. (Tr. 154). She continued to report multiple complaints over the next several months, including right shoulder pain and tightness, stomach pains, left hip aches, backache, dyspnea, and depression. (Tr. 149-153).

---

[2]Most of these records are illegible.

During the interview on October 13, 2000, claimant began crying and accused Dr. Boudreaux of telling lies to the insurance company. (Tr. 149). He assured her that at no time had he lied to her, and that he had referred her to specialists in an effort to fully evaluate and treat her problems. (Tr. 147). He told her that since she no longer had confidence in his professional care of her, she should seek care elsewhere.

**(3) Records from Iberia Mental Health Clinic dated October 21, 1999 to March 1, 2000**. Claimant was admitted for major depressive disorder, single, moderate. (Tr. 172). She was formally discharged on March 1, 2000. (Tr. 171). Her prognosis was fair. (Tr. 171).

**(4) Records from University Medical Center ("UMC") dated May 21, 1999 to January 20, 2005**. In 1999 and 2000, claimant was seen for back pain, depression, sleep problems, hyperthyroid, shortness of breath, and palpitations. (Tr. 242-68). Lumbar spine and hip x-rays taken on May 21, 1999, showed no specific abnormalities except for mild dextrorotatory scoliosis. (Tr. 261).

A pulmonary function report dated January 28, 2000, showed good efforts, but was somewhat inconsistent. (Tr. 234). FEV1 ranged from 2.48 to 3.54. The impression was a mild obstructive ventilatory defect with reversible component. (Tr. 237). Dr. Youngsook Yoon recommended a course of bronchodilators.

X-rays of the thoracic and lumbar spines taken on April 17, 2000, showed osteopenia. (Tr. 210, 215). Cervical spine x-rays were normal. (Tr. 211). A thyroid scan dated May 11, 2000, was normal. (Tr. 209).

Claimant was hooked up to a Holter monitor on March 17, 2000, for complaints of shortness of breath and palpitation. (Tr. 226). The interpretation was normal sinus rhythm throughout with episodes of tachycardia with rates as high at 150 BPM. An echocardiographic report showed normal results. (Tr. 231).

Claimant was seen on August 15, 2000, for hyperthyroidism and back pain. (Tr. 203). An MRI dated December 14, 2000, showed early disc degeneration at L5-S1, but was otherwise normal. (Tr. 199). The impression was chronic lower back pain. (Tr. 197).

On December 6, 2001, claimant complained of headaches and falling a lot. (Tr. 181). The impression was hyperthyroid, stable, and low back pain. A barium swallow on January 8, 2002, was normal. (Tr. 535).

Claimant was seen for hyperthyroid, low back pain, and asthma on August 27, 2002. (Tr. 325). She was continued on Ultram. Her asthma was not controlled, and her medication was changed. (Tr. 321, 325).

On May 14, 2002, claimant was seen for hyperthyroid and low back pain. (Tr. 317). The assessment was low back pain. She was prescribed Ultram and

hypertension medication.

A pulmonary function report dated November 27, 2002, showed an FEV1 ranging from 3.17 to 3.66. (Tr. 328).

On January 28, 2003, claimant complained of asthma and chronic low back pain. (Tr. 491). A dorsal/thoracic spine MRI showed no abnormality. (Tr. 476). A pulmonary function report showed an FEV1 range from 3.13 to 3.53. (Tr. 465, 469). Spirometry was normal.

On October 30, 2003, claimant complained of shortness of breath. (Tr. 460). She also complained of chronic lower back pain.

On April 29, 2004, claimant was seen for hypertension, acid reflux, hypothyroid, low back pain, and asthma. (Tr. 597). Her blood pressure was controlled. She was prescribed Hydrocodone and Flexeril. (Tr. 598).

An MRI dated December 21 2004, showed a mild disc bulge at L5-S1 with mild degenerative disc disease. (Tr. 611). A thyroid uptake and scan taken on January 6, 2005, was within normal limits. (Tr. 610). A pulmonary function report dated January 5, 2005, showed an FEV1 ranging from 3.20 to 3.38. (Tr. 606).

**(5) Consultative Examination by Dr. Harold A. Heitkamp dated March 22, 2002**. Claimant complained of pain radiating up to her shoulder blades, leg pain, fatigue, constant headaches, trouble swallowing, right breast pain, shortness

of breath, asthma, and depression. (Tr. 212-13, 288). Her medications included Fiorinal for headaches, Albuterol for asthma, Remeron and Wellbutrin for depression, and Mobic anti-inflammatory.

On examination, claimant was 5 feet 4 ½ inches tall and weighed 150 pounds. Her blood pressure was 136/100. She walked in with a slow lumbering gait favoring her right leg.

In the cervical spine, claimant had slight spasm in the left paracervical area. (Tr. 213). She was tender at C4-5, both shoulders, and both elbows. She had trigger points in the trapezius. She had limited range of motion and pain in her neck. She had slight weakness in the right hand. She was slightly tender over the right frontal sinus.

In the lumbar spine, claimant could squat 20 degrees out of 95, and complained of pain in her back and knees. She could not get up on her toes or back on her heels. She had difficulty taking her socks off. She had no spasm. Claimant had limited range of motion.

On straight leg raising, claimant had pulling, but no signs of sciatic irritation. She had limited range of motion in her hips. Her knees had full range of motion. Claimant had normal sensation to pin prick.

Claimant was tender in both hips, trochanteric area and knees. She had all of the trigger points of fibromyalgia.

Dr. Heitkamp's impression was marked fibromyalgia; mental depression under treatment, but not well-controlled with marked labile emotions, and chronic lumbar sacral sprain/strain. (Tr. 214). He opined that the combination of her fibromyalgia, markedly labile emotions, and marked complaints of pain in her lower back rendered her "unable to do much of anything at this time." He stated that she needed treatment for her fibromyalgia and more aggressive treatment for depression.

Dr. Heitkamp believed that most of claimant's pain was from fibromyalgia and post-lumbar pain syndrome with marked emotional liability. He thought that with these problems, claimant was "not emotionally capable for the stress of any position."

**(6) Consultative Psychological Evaluation by Naomi L. Friedberg, Ph.D., dated March 2, 2002**. Claimant reported that she had received mental health treatment, including psychotropic medications and counseling. (Tr. 271). However, she was not receiving any psychotherapy at that time. Her medications included Mobic, Fiorinal, an Albuterol pump, and Wellbutrin, which she said was working somewhat.

On examination, claimant was alert and responsive. (Tr. 272). There was some mild distress in her depressed demeanor. Her mood was mildly depressed, and her affect was appropriate to mood. She reported that she cried a lot, withdrew from others, and worried, because she could not do what she used to be able to do prior to the car accident in 1999.

Claimant indicated that her depression had improved some, and she was generally well-maintained on her medications, but she was still "always kind of depressed." Her thought processes were logical and coherent, with no preoccupations, delusions, obsessions, or phobias noted or reported. However, she admitted to compulsively "checking" for the past year. This, claimant explained, was because she had a poor short-term memory, and often forgot whether she had turned off the stove or locked the door. Dr. Friedberg thought, however, that claimant's behavior appeared to be more compulsive in nature than as a result of poor short-term memory. Claimant had a history of auditory hallucinations, but denied any current hallucinatory phenomenon.

Dr. Friedberg opined that claimant appeared to meet the criteria for major depressive disorder, recurrent, mild to severe. She thought that claimant's depression appeared to be directly related to the chronic pain she had endured since the car accident in 1999. She noted that claimant had reportedly tried to

return to work, but had quit due to the severity of her chronic pain. She recommended that claimant's attending physician assess how her physical difficulties negatively impacted her ability to work.

**(7) Psychiatric Review Technique ("PRT") Form dated March 7, 2002**. Lawrence E. Klusman, Ph.D., assessed claimant for affective disorders. (Tr. 274). He found that her impairment was not severe. He determined that she had mild restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 284).

**(8) Residual Functional Capacity ("RFC") Assessment – Physical dated April 4, 2002**. The medical consultant determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 290). She could stand/walk and sit about six hours in an eight-hour workday. She had unlimited push/pull ability. She could occasionally perform all postural activities, except that she could never climb ladders, ropes, or scaffolds. (Tr. 291).

**(9) Records from Dr. Craig Frederick dated May 16, 2001 to May 17, 2002**.[3] On May 19, 2001, claimant complained of depression, increased crying spells, and poor sleep and appetite. (Tr. 300-03). On May 17, 2002, she reported

_____

[3]Some of these records are illegible.

that she was about 30% improved.  (Tr. 298).

**(10) Consultative Examination by Dr. Kenneth A. Ritter, Jr., dated April 5, 2004**.  Claimant complained of chronic pain syndrome/fibromyalgia with back and right hand pain; asthma, which was very well-controlled with medication; hypertension, which she did not check at home; a history of gastroesophageal reflux, which was markedly improved with medications; a history of depression, which was much better with medications, and daily mid-high anterior chest pains.  (Tr. 565).  Her medicines included Flonase nasal inhaler, Paxil, Mavik, Singulair, Flexeril, Protonix, Zyrtec, Serevent inhaler, Pulmicort inhaler, Celebrex, and nebulizer treatments with Ventolin as needed.

On examination, claimant was 5 feet 6 inches tall, and weighed 157 pounds. (Tr. 566).  Her blood pressure was 158/92.  Lungs were clear.  Her heart had sinus rhythm with a grade 2/6 systolic murmur along the left lower sternal border.

Claimant had a normal gait and station.  (Tr. 567).  She had no ankle swelling and normal pedal pulses.  Joints had no redness, heat, tenderness or swelling.

With straight-leg raises, claimant complained of low back pain.  She cried out when Dr. Ritter attempted to do this, but then was able to sit up with her legs out at 90 degrees without complaints.  DTRs were 2+ and equal bilaterally.

Dr. Ritter's impression was hypertension with elevated blood pressure on examination; chronic intermittent back pain, and asthma, which was controlled with regular medications.

In the Medical Assessment of Ability to do Work-Related Activities, Dr. Ritter determined that claimant had no limitations as to lifting/carrying, standing/walking, or sitting.  (Tr. 568).  He found that she could frequently perform all postural activities.  He noted that her asthma would limit her from being around dust and fumes.  (Tr. 569).

**(11) PRT dated April 30, 2004**.  Dr. Klusman found that claimant's depression was not severe.  (Tr. 572, 575).  He determined that she had no restriction of activities of daily living.  (Tr. 582).  He found that she had mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  He noted that she was doing much better with medication.  (Tr. 584).

**(12) RFC Assessment dated May 8, 2004**.  Dr. Lalit Barai found that claimant could lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk about six hours in an eight-hour day, and had unlimited push/pull ability.  (Tr. 587).  She had occasional limitations as to climbing.  (Tr. 588).  She was to

avoid all exposure fumes, odors, dusts, gases, poor ventilation, *etc*., because of asthma.  (Tr. 590).

**(13) Records from New Iberia Mental Health dated June 17, 2005 to June 19, 2006**.  Claimant was admitted for depression.  (Tr. 715).  She reported constant fatigue, anxiety, feelings of doom and depression, and that people were out to harm her.  (Tr. 713).  She was prescribed medication.  (Tr. 721).

On March 9, 2006, claimant was diagnosed with schizoaffective disorder. (Tr. 877-78).  She had reported having auditory hallucinations which had persisted despite her improvement in mood.   (Tr. 877).  She was prescribed Elavil, Effexor, and Risperdal.  (Tr. 867).

**(14) Records from UMC dated February 3, 2005 to May 2, 2006**.  On February 3, 2005, claimant was seen for chest pain.  (Tr. 757).  X-rays showed no evidence of acute chest disease.  She had a borderline ECG.  (Tr. 752, 770).  Her diagnoses were moderate and persistent asthma, allergic rhinitis, and chest pain. (Tr. 749).

A stress test on March 8, 2005, was negative.  (Tr. 746).  Spirometry on July 25, 2005, showed an FEV1 ranging from 3.03 to 3.19.  (Tr. 729).

On August 30, 2005, claimant complained of back pain.  (Tr. 724).  The assessment was hypertension, hyperthyroidism, and asthma.  (Tr. 726).

Claimant was seen for severe, persistent asthma, allergic rhinitis, and hypertension on October 12, 2005. (Tr. 789). She was continued on her medications.

On February 2, 2006, claimant complained of generalized pain, asthma, fibromyalgia, depression, hypertension, GERD, and hyperthyroid. (Tr. 816). Her hypertension and asthma were controlled. (Tr. 817). She was prescribed Elavil and Lexapro for depression, and Feldene for fibromyalgia.

**(15) Claimant's Administrative Hearing Testimony**. At the hearing on June 6, 2006, claimant was 34 years old. (Tr. 904). She testified that she was 5 feet 5 inches tall, and weighed 186 pounds. She reported that she had gained 50 pounds over the last several years.

Claimant had completed high school. (Tr. 905). She had taken courses in high school for CNA, and had obtained her license. She had past work experience as a CNA and a valet at a casino. (Tr. 906-07).

Regarding activities, claimant testified that she had last driven two months prior. (Tr. 906). She stated that driving made her nervous. She said that she watched a little television for about an hour a day, but mainly slept. (Tr. 910).

Claimant stated that she became disabled on May 21, 2002, after a car accident in 1999. (Tr. 907). She testified that she had tried to go back to work,

14

but became short-winded and had constant pain in her arms, legs, and back.

As to depression, claimant reported that she cried about three times daily. (Tr. 908, 915). She testified that she would rather just sleep and not think about her pain. (Tr. 908). She said that she sat down for a little while, but spent most of the day in bed because of her medications. (Tr. 916, 918).

Regarding restrictions, claimant testified that she had pain when she lifted a gallon of milk or juice. (Tr. 909). She said that she had problems with bending when putting on her clothes, and had to have assistance. (Tr. 910). She stated that she could walk about 10 feet before having to stop and catch her breath. (Tr. 913).

Claimant reported that she was limited to standing about an hour to an hour and a half over the course of a day, and 30 minutes at a time because of back pain. She stated that she could sit for about 30 minutes. (Tr. 914). She said that she could not reach forward or overhead. She also testified that she could not stoop.

Additionally, claimant said that she could use her hands to pick up small objects "a little." She reported that she had trouble staying focused. (Tr. 915). She stated that she did not care to be around anyone or groups of people.

Claimant also said that she had more pain during cold weather. She stated that she had trouble being around smoke, pollen, dust, and chemicals. She reported that she used a nebulizer three to four times a day for asthma. (Tr. 917).

Claimant testified that she had been admitted to the hospital one week prior for an anxiety attack. (Tr. 911). She stated that she went to UMC and New Iberia Mental Health for treatment. She reported that she was taking Effexor, Elavil and Risperdal for her mental problems; Ultram for pain; Ativan for anxiety, Zyrtec, Flonase, Singulair, Albuterol, Proventil, and Advair for asthma; Atenolol and Mavik for high blood pressure; Celebrex for pain; Hydrochlorothiazide for fluid, and Premarin for hormone replacement. (Tr. 912-13).

Claimant complained that some of her medications caused stomach cramps and sleepiness. (Tr. 913, 918). She said that her anti-depressants helped a little bit, but not much. (Tr. 919).

**(16) Administrative Hearing Testimony of George Smith, Medical Expert**. Dr. Smith opined that claimant did not meet or equal a listing or combination of listings. (Tr. 922). He testified that her restrictions as to daily functioning would be related to her asthma, including that she avoid extremes of cold and heat, as well as exposure to noxious fumes.

**(17) Administrative Hearing Testimony of Shirley Dickie, Vocational Expert ("VE")**. Ms. Dickie testified that claimant's job as a CNA or nursing assistant was medium with an SVP of four; parking lot attendant was light with an SVP of two, and fast food cook was light to medium with an SVP of 3. (Tr. 927).

16

The ALJ posed a hypothetical in which he asked Ms. Dickie to assume a 34-year-old claimant with a 12th-grade education with the same work history as claimant, and who had the same limitations to which claimant had testified. In response, the VE opined that claimant could not do any of her past work. (Tr. 928).

When the ALJ changed the hypothetical to assume a claimant with the same background; who could lift 20 pounds occasionally or 10 pounds frequently; walk, stand, or sit for six hours in an eight-hour day; had a history of asthma and breathing problems which required a climate-controlled job with little fumes or irritants; had problems with depression causing mild limitations on activities of daily living and moderate limitations on social functioning and concentration, persistence, and pace, and limited claimant to jobs with simple one-, two-, or three-step instructions, and required limited interaction with co-workers and the public, Ms. Dickie identified the jobs of sedentary assembler, of which there were 4,080 jobs statewide and 237,224 nationally, reduced to 25%, and light assembler, of which there were 9,811 jobs statewide and 1,699,700 nationally, reduced to 25%. (Tr. 929-30).

The ALJ modified that hypothetical to assume a claimant with the same exertional limits who had mild limitations in activities of daily living, moderate limitations in social functioning, mild limitations in concentration, persistence,

and pace, and limited co-worker and public interaction. (Tr. 931). In response, Ms. Dickie added the job of file clerk, of which there were 4,165 light jobs statewide and 301,282 nationally, and sedentary record clerk, of which there were 2,028 positions statewide and 131,953 nationally, reduced by 25%. She further stated that none of those positions allowed any types of unscheduled breaks if claimant had crying spells. (Tr. 932).

Claimant's attorney added claimant's need for asthma treatments with a nebulizer four times a day. (Tr. 933). In response, Ms. Dickie stated that claimant would require "modified" work to accommodate her, which would reduce the identified job numbers to less than 1%. (Tr. 933-34).

**(18) The ALJ's Findings**. Claimant argues that the record does not support the finding that she could perform competitive, sustained work. Because I find that the ALJ erred in finding that claimant had the ability to maintain employment, I recommend that this matter be **REVERSED** and that the claimant be awarded benefits.

Here, the consultative examiner, Dr. Heitkamp found that claimant had all of the trigger points of fibromyalgia on examination. (Tr. 213). His impression was marked fibromyalgia; mental depression under treatment, but not well-controlled with marked labile emotions, and chronic lumbar sacral sprain/strain.

(Tr. 214).  He opined that the combination of claimant's fibromyalgia, markedly labile emotions, and marked complaints of pain in her lower back rendered her "unable to do much of anything at this time."  He stated that she needed treatment for her fibromyalgia and more aggressive treatment for depression.

Dr. Heitkamp believed that most of claimant's pain was from fibromyalgia and post-lumbar pain syndrome with marked emotional liability.  He thought that with these problems, claimant was not emotionally capable for the stress of any position.  The undersigned finds that Dr. Heitkamp's opinion is especially compelling in light of the fact that he is the physician for the Social Security Administration, and not claimant.  Further, the records from claimant's treating physicians at UMC indicate that claimant is still under active treatment for depression and fibromyalgia.  (Tr. 817).

Regarding claimant's mental condition, the records reflect that claimant has received treatment for depression since 1999.  (Tr. 171-72; 271-72).  As set forth in § 12.00 (D)(2), proper evaluation of claimant's impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  "Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish your impairment severity."  *Id*.

Claimant's most recent mental health records indicate that had schizoaffective disorder, for which she was prescribed Elavil, Effexor, and Risperdal. (Tr. 867, 878). As Dr. Heitkamp opined, claimant not emotionally capable for the stress of any position.

Claimant further testified that she had sleepiness secondary to her medications. She stated at the hearing that she was taking several medications, including Elavil, Effexor, and Risperdal, Ultram, Ativan for anxiety, Zyrtec, Flonase, Singulair, Albuterol, Proventil, Advair, Atenolol, Mavik, Celebrex, Hydrochlorothiazide, and Premarin. (Tr. 913, 919). However, the ALJ failed to address any side effects in the decision. Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). This constitutes error.

According to the medical records, claimant would be unable to maintain gainful employment based on her complaints. Dr. Heitkamp reported that claimant was not emotionally capable for the stress of any position The vocational expert, Ms. Dickie, confirmed that claimant would be unable to perform any work if her testimony as to her complaints was fully credible. (Tr. 928). Further, Ms. Dickie

testified that the jobs which she did identify in response to the ALJ's hypotheticals would be reduced *to less than 1%* if claimant were limited to jobs which would accommodate her use of the nebulizer several times a day.   (emphasis added). (Tr. 933-34).

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that she can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job she finds for a significant period of time." *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (*citing Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)).  Further, the ability to work only a few hours a day or to work only on an unpredictable or intermittent basis does not constitute the ability to engage in "substantial gainful activity."  *Tucker v. Schweiker*, 650 F.2d 62, 64 (5th Cir. 1982); *Cornett v. Califano*, 590 F.2d 91, 94 (4th Cir. 1978); *Prestigiacomo v. Celebrezze*, 234 F.Supp. 999 (E.D. La. 1964).

Here, the ALJ erred in failing to determine whether claimant was capable not only of obtaining employment, but also maintaining it.  *Watson*, 288 F.3d at 218.  Claimant's long-time treating physicians at UMC and Iberia Mental Health, as well as Dr. Heitkamp, indicated that claimant would be unable to sustain

employment. That opinion is supported by the record as a whole. Thus, the decision of the ALJ should not stand.

Accordingly, it is my recommendation that the Commissioner's decision be **REVERSED**, and the claimant be awarded benefits. The undersigned recommends that May 22, 2001, which is also the date of the filing of the applications, be used as the onset date for the commencement of benefits.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED**

**PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE**

**LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT,**

**EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED*

*SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Signed May 26, 2009, Lafayette, Louisiana.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE